**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------X
GORDON C. NEWSOME,

                              Plaintiff,

              -against-                                          **MEMORANDUM OF**
                                                                **DECISION AND ORDER**
MICHAEL J. ASTRUE, Commissioner of              09-CV-4179 (ADS)
Social Security,

                              Defendant.

---------------------------------------------------X

<u>**APPEARANCES:**</u>

**Nassau Suffolk Law Services**
*Attorneys for the plaintiff*
One Helen Keller Way, 5th Floor
Hempstead, NY 11550
          By:  Milton J. Braxter, Esq., Of Counsel

**Loretta E. Lynch, United States Attorney**
**for the Eastern District of New York**
*Attorneys for the defendant*
610 Federal Plaza
Central Islip, NY 11722
          By:  Assistant United States Attorney Robert W. Schumacher, II, Esq.,

**SPATT, District Judge**.

          Gordon C. Newsome ("Newsome" or "the Plaintiff") commenced this action pursuant to

the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging a final determination by

Michael J. Astrue, the Commissioner of Social Security ("the Commissioner") that he was

ineligible for benefits. Currently before the Court are cross-motions for judgment on the

pleadings by the Commissioner and the Plaintiff pursuant to Fed. R. Civ. P. 12(c). For the

reasons discussed below, the Plaintiff's motion for judgment on the pleadings is granted and this

case is remanded on the grounds set forth in the decision.

# I. BACKGROUND

## A. Procedural History

On November 12, 2004, Newsome filed an application for social security disability benefits, alleging a disability and inability to work since May 5, 2004, due to seizures and problems with concentration and balance. On December 31, 2004, the Social Security Administration ("SSA") denied his application and Newsome made a timely request on January 27, 2005 for a hearing before an Administrative Law Judge ("ALJ").

On May 2, 2007, a hearing was held before ALJ Iris K. Rothman (the "ALJ"). Following the hearing, in a decision dated August 1, 2007, ALJ Rothman denied Newsome's claim for disability benefits. Newsome sought review of the ALJ's decision by the Appeals Council, which appeal was denied on January 31, 2008. That same day, Newsome requested that the Appeals Council consider additional evidence related to his case. On March 6, 2008, the Appeals Council set aside its January 31, 2008 denial, and, after considering the additional evidence, denied Newsome's request for review, making the ALJ's decision the final decision of the Commissioner. Newsome commenced this civil action on September 25, 2009.

## B. The Record

### 1. The Plaintiff's Background and Testimony

Newsome was born in 1959 and was 47 years old at the time of the hearing before the ALJ. He completed high school and worked as a truck driver from 1982 until December of 2003. His job as a truck driver, where he also had to unload the truck and deliver merchandise, required him to walk and stand for up to four hours per day; sit or climb up to five hours per day; as well as other exertional and non-exertional tasks. In addition, he frequently had to lift 50 pounds or more, and occasionally 100 pounds or more. After having a number of seizures on the job, the company that employed Newsome changed his job to a "warehouse helper". Newsome

testified that the company ultimately terminated his employment in May 2004 after he had a seizure because his job at the warehouse required him to be around heavy machinery and they felt that his seizures made him "an insurance liability". (R. 314.) In his application for social security disability benefits, Newsome cites the seizures and their effect on his concentration and balance as the reason he could no longer work.

Although Newsome continued to look for work after May of 2004, he testified at the hearing that he could not work when the seizures were very active. Newsome's first major seizure occurred in November 2003. Subsequently, Newsome stated that he was having seizures once or twice every three months between November of 2003 and January 2007. When confronted with his medical records at the hearing, Newsome recalled that he did not have a seizure from 2005 until 2006, but also that the medical records would not reflect all of his seizures because sometimes he had seizures in his sleep. On January 27, 2005, Newsome indicated in his Disability Appeal Report that there had been a change in his condition as of December 20, 2004, when he lost feeling and had numbness in his lower legs and feet.

During the period from 2005 to 2006 when Newsome did not experience any seizures, he continued attempting to find work. Although he could not gain employment as a truck driver because of his seizure disorder, in June of 2006, he managed to get temporary work at a company called Sigma Temporary working in the warehouse. However, after one month on the job, Newsome had what he refers to as a "pancreatic attack". (R. 322.) As a result, Newsome had to leave that job because the pancreatic attack made it difficult for him to do the heavy lifting associated with the job. In late 2006, Newsome spent his time looking for work; attending an alcohol and drug treatment program that met five days a week, four hours a day; attempting to maintain his "abstinence" from drinking; and staying mobile to help reduce the pain and swelling

in his pancreas. (R. 327.) In January of 2007, Newsome fell and fractured his left hip for which he continued to receive physical therapy at the time of the hearing in May of 2007.

When asked about his alcohol consumption, Newsome denied that he was a "heavy drinker" or that he abused alcohol "in excess", and stated that he was only a social drinker who consumed one to two drinks a day, one to three times per week. (R. 317–18; 322.) He testified that his last drink was in January of 2007. Newsome claims that he is prevented from working due to a seizure disorder, pancreatitis, a pseudocyst on his pancreas, anemia, numbness in his legs, and pain from blood clots in his legs and groin area.

Newsome's last seizure was in January of 2007. With respect to the pain in his pancreas, Newsome testified that he experienced his first "pancreatic attack" sometime between December 2005 and January 2006 and his second in April 2006. He testified at the hearing that he was "alright" between the attacks. (R. 328.) After the pancreatic attack in April of 2006, the doctors diagnosed Newsome with pancreatitis and discovered a large cyst on Newsome's pancreas. According to Newsome, the problems with his pancreas caused him "extreme pain" and continued to do so at the time of his hearing in May of 2007. (R. 327.) Despite the fact that the medical records show that he was taking prescription pain medication in 2005 and 2006, at the hearing Newsome testified that he did not start taking prescription medication for his pain until January 2007. Although he no longer has the pancreatic attacks, the cyst and his additional conditions cause Newsome constant pain that prevents him lifting more than 20 pounds; sitting for longer than one, two, or three hours at a time; standing for more than anywhere between half an hour and two hours at a time; and walking for more than an eighth of a mile.

In addition, Newsome's anemia sometimes made him tired, although he treats his anemia with iron supplements and vitamin therapy. Finally, Newsome testified that he had pain in his

leg from the hip fracture that required him to frequently lay down, but that prior to the hip

fracture he also had leg pain from blood clots and anemia.

### 2. Medical Evidence

#### a. Mercy Medical Center

On June 24, 2004, Newsome was admitted to the Mercy Medical Center ("MMC")

emergency room after suffering a severe tonoclonic seizure.  Dr. Mahmoud Shaaban treated

Newsome during his stay.  According to the discharge summary prepared by Dr. Shaaban, the

principal diagnoses were alcohol withdrawal, seizure due to alcohol withdrawal, hypokalemia,

substance abuse and hypertension.  The hospital performed a CAT scan of Newsome's brain,

which showed no evidence of any acute intracranial problem.  Dr. Shaaban reported that he had a

"significant past history of alcohol dependency and other drug abuse (cannabis)" and that

Newsome's family and Newsome himself informed Dr. Shaaban that Newsome had a history of

repeated seizures associated with alcohol withdrawal.  (R. 103.)  Following this treatment, Dr.

Shaaban noted that Newsome showed no additional sign of seizures, alcohol withdrawal, or

tremors and discharged him on June 29, 2004.

Newsome was admitted to the MMC again on September 29, 2004, following another

seizure at his home.  Dr. Kauser Yasmeen treated Newsome during his stay.  According to a

discharge summary prepared by Dr. Yasmeen, the hospital admitted Newsome for seizures,

alcohol withdrawal, and pancreatitis.  Dr. Yasmeen reported that Newsome informed her that he

drinks one pint of vodka daily and that his last drink was the day before his seizure.  In noting

Newsome's past medical history, Dr. Yasmeen cited alcohol abuse and a questionable seizure

disorder and hypertension.  In addition, Dr. Yasmeen noted that Newsome had been

noncompliant with taking his prescribed anti-seizure medications.  A toxicology screen was

negative, except for alcohol, which was found to be 88 mg/cc. Newsome also saw a gastroenterologist who examined Newsome and reported that he likely had alcohol pancreatitis and hepatitis associated with alcohol.

During his stay, Newsome underwent a CT scan, EEG, and examination by a neurologist, Dr. Jean-Robert Desrouleaux. Newsome's CT scan showed "general cerebral atrophy with no bleed or infarct" (R. 111), and the EEG showed no abnormalities (R. 121–22). After examining Newsome, Dr. Desrouleaux diagnosed Newsome with an alcohol withdrawal seizure and requested an EEG and repeat head scan.

Newsome had his final seizure in January of 2007 causing him to fall and fracture his left hip. As a result, Newsome was admitted to the MMC on January 8, 2007, this time under the care of Dr. Roules Salib. Dr. Salib's primary diagnoses were a seizure disorder and a left hip fracture, and secondary diagnoses included alcohol abuse, anemia, and a pancreatic pseudocyst. During his stay at the MMC, Newsome was treated for deep vein thrombosis ("DVT") in his right leg. The treatment involved implanting a permanent vena cava filter in his right femoral vein.

### b.  Nassau University Medical Center

From December 31, 2005 until January 5, 2006, Newsome was admitted to the Nassau University Medical Center ("NUMC") because he had been vomiting for two days and was suffering from abdominal pain. The discharge summary prepared by Dr. Shahab Ahmad stated that his final diagnosis was "acute pancreatitis" and that his secondary diagnosis was a seizure disorder. A CT scan of Newsome's abdomen on May 31, 2006 revealed findings compatible with pancreatitis and free fluid in the pelvis. In addition, the CT scan showed that Newsome had a 2.0cm pseudocyst on his pancreas.

On November 11, 2006, Newsome went to the NUMC with complaints of five to seven days of abdominal pain. Newsome informed the doctor that his last drink had been two days prior to his admittance. The doctor diagnosed Newsome with alcoholic pancreatitis and advised him to stop drinking.

Subsequent to his hip fracture in January 2007, Newsome was admitted to the Nassau Extended Care Facility for physical therapy related to his hip fracture. Upon his discharge on February 28, 2007, the doctor noted that Newsome was independent in his ambulation; that he never showed impaired judgment or confusion; and was sociable and had no difficulty adjusting to his surroundings.

### c. Dr. Bernard Berkowitz, MD

Following an annual physical at NUMC on April 1, 2005, where Newsome complained of numbness and tingling in both of his legs, the attending physician, Dr. Gupta, ordered an MRI and referred Newsome to Dr. Berkowitz, a neurologist at NUMC, for a neurology consult. Dr. Berkowitz met with Newsome on April 27, 2005 to perform the neurology examinations and review the results of his MRI, which revealed a mild disc desiccation throughout the lumbar spine. Newsome told Dr. Berkowitz that between November of 2003 and December 2004 he had experienced a total of seven to eight seizures. Dr. Berkowitz noted that Newsome was currently in an alcohol abuse treatment program and that Newsome represented that he had not consumed alcohol since January 26, 2005. The physical examinations revealed that Newsome had normal strength and intact sensation, but that he had "impaired heel to toe gait" and "impaired toe/heel walking", a tender spot in the lower dorsal spine and a muscle spasm in the dorsal region. (R. 297.) As a result of the examination, Dr. Berkowitz ordered an MRI of Newsome's spine, an

EEG, a total body bone scan, and a consultation with a doctor in the Physical Medicine & Rehabilitation department ("PM&R").

Following the examination, Dr. Berkowitz prepared a Medical Report for Determination of Disability/Employability for DSS ("DSS Report") dated April 27, 2005, diagnosing Newsome with a seizure disorder, a thoracic spine lesion and myelopathy, and stating that he was prevented from working by pain, paresthesias, and electrical sensations from around his lower back. Dr. Berkowitz reported that Newsome was not employable because of a suspected thoracic spine abnormality and that whether he could work depended on the results of his MRI and PM&R evaluation. In addition, Dr. Berkowitz noted that Newsome did not have any mental restrictions or impairments and could concentrate long enough to complete a work task.

On June 1, 2005 Newsome had a follow-up appointment with Dr. Berkowitz. Dr. Berkowitz noted that the results of the MRI's, EEG, and total body bone scan that Dr. Berkowitz ordered after the April 27, 2005 examination came back negative and cited no abnormalities. After examining Newsome again Dr. Berkowitz stated that his impression was that the symptoms may be caused by alcoholic polyneuropathy and ordered a MRI of the cervical spine and an EMG. Both tests showed no abnormalities and the EMG results specifically stated that there was "no evidence of neuropathy". (R. 272.)

With respect to the PM&R consult ordered by Dr. Berkowitz at the April 27, 2005 examination, Newsome attended physical therapy sessions at the NUMC. On July 13, 2005, Dr. Scott Johnson of the PM&R department examined Newsome and concluded that Newsome's bilateral paresthesia—the numbness and tingling feeling in his legs—was likely alcohol related because Newsome had represented that he stopped drinking in February 2005 and the paresthesia was resolving. As a result, Dr. Johnson discharged Newsome from physical therapy.

On July 27, 2005, Dr. Berkowitz prepared a Medical Report for DSS where he diagnosed Newsome with a seizure disorder and stated he was prevented from working and not employable due to pain, paresthesias in his legs, sharp pains in his neck and electrical sensations (the July 2005 Report).

Dr. Berkowitz met with Newsome again on October 18, 2005 to address Newsome's complaint of headaches over the prior three months that he described as different from his previous headaches. Dr. Berkowitz noted that Newsome had a seizure disorder that he thought was alcohol related and sensory polyneuropathy. Dr. Berkowitz ordered a CT scan and told Newsome to continue taking his prescription medication.

On November 1, 2005, based on the October 18, 2005 examination, Dr. Berkowitz prepared a DSS Report diagnosing Newsome with seizure disorder, polyneuropathy, and headaches over the prior three months and stating that Newsome was prevented from working by pain, paresthesias, electrical sensations in his lower extremities, and headaches (the November 2005 Report). Dr. Berkowitz also reported that Newsome was not employable because he was evaluating him for headaches and there was a pending CT scan of Newsome's head.

The results of the CT scan of Newsome's head came back on October 26, 2005 and were normal and unremarkable.

### d. Dr. Imran Wahedna, MD

Following Dr. Berkowitz's retirement, Dr. Wahedna became Newsome's treating neurologist at the NUMC. The record only contains Dr. Wahedna's treatment notes, which the Court observes are fairly difficult to read. From what the Court can decipher, the notes state as follows. On April 25, 2007, Dr. Wahedna examined Newsome and found that although Newsome complained of numbness in his lower extremities, there was no evidence of

neuropathy in his back or lower extremities.  Dr. Wahedna noted that Newsome walked with a cane due to his hip fracture.  Dr. Wahedna's May 18, 2007 treatment notes state that the neuropathy results were negative and that Newsome's symptoms were possibly secondary to alcohol abuse for what Dr. Wahedna thinks is twenty years.  Finally, on June 6, 2007, Dr. Wahedna states that Newsome had a history of seizure disorders but follows it with a question mark based on the fact that his last seizure was in January 2007 when he sustained the hip fracture. Dr. Wahedna also notes that Newsome has a history of alcohol abuse, hypertension, anemia and was on the prescription medication Coumadin.  In the space next to the notation indicating that Newsome had lower extremity numbness, Dr. Wahedna states that his EMG showed no neuropathy and that Newsome continues to complain of headaches and numbness in his lower extremities.

### e. John Powers, FNP

John Powers is a Nurse Practioner ("NP Powers") at the South Franklin Clinic who served the function of Newsome's treating physician for the five years prior to Newsome's hearing.  On December 29, 2004, NP Powers prepared a Physical Residual Functional Capacity Assessment report for DSS ("RFC Report") diagnosing Newsome with alcohol induced seizures. With respect to exertional limitations, NP Powers noted that Newsome could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand and/or walk about six hours in an eight hour workday, and do unlimited pushing or pulling.  NP Powers based these finding on Newsome's seizure disorder; alcohol induced seizures; non-compliance with medications; failure to seek regular doctor care for seizures; the fact that his EEG was normal; and that Newsome had admitted to drinking large quantities of vodka.  NP Powers further noted that Newsome did not have any postural limitations, manipulative limitations, visual limitations, communicative

limitations, or environmental limitations. With respect to Newsome's symptoms, NP Powers stated that Newsome alleges he has seizures, which is partially credible in light of his medical record, but that he drinks alcohol and is non compliant with his medication and does not receive regular treatment. Finally, NP Powers noted that Newsome could do light work, not involving dangerous machinery, such as a mail clerk, a room service clerk or assembler of small products.

On August 1, 2006 Mr. Powers prepared a DSS Report based on a July 14, 2006 examination diagnosing Newsome with a seizure disorder, pancreatitis, alcohol abuse, potential vein thrombosis, anemia, hypertension, a pancreatic pseudocyst and abdominal pain. NP Powers noted that Newsome was prevented from working based on his antiseizure therapy, alcohol abuse, seizures, abdominal pain and fatigue and that he was not employable because of his abdominal pain and his alcohol abuse treatment program. Although NP Powers notes that Newsome cannot perform any work, he also circled that Newsome could perform sedentary work.

In association with Newsome's instant application for social security benefits, NP Powers and Dr. Mark W. Rogow submitted a report addressing Newsome's medical condition and residual functional capacity ("RFC") based on their treatment of him two to three times a month from May 31, 2006 through April 23, 2007 (the "May 2007 RFC report"). (R. 176.) The report describes Newsome's symptoms as including a history of abdominal pain secondary to pancreatitis; a seizure disorder; DVT to his right leg causing pain in ambulation; and neuropathy to his lower extremities. The diagnoses include a seizure disorder, DVT, chronic pancreatitis, anemia, an abdominal cyst, thrombosis and embolism, alcohol abuse, and neuropathy. The treatment that Newsome received included hospitalization on numerous occasions for abdominal pain and pancreatitis; thrombolic embolism filter implant for DVT; treatment for seizures,

anemia, hypertension; and treatment for neuropathy in his lower extremities that is secondary to alcohol abuse. According to the report, Newsome's medical conditions are expected to last longer than twelve months. The report also states that Newsome has to lay down during the day due to DVT pain in his lower extremities, abdominal pain, neuropathy in his lower extremities, and tremors in his upper extremities.

With regard to Newsome's physical limitations, the report states that that the Plaintiff can sit for a half an hour, stand for an half an hour, and walk for a half an hour continuously and "total in an eight hour work day", but cannot lift, carry, bend, squat, crawl, or climb. The report also states that Newsome has to lay down during the day due to DVT pain in his lower extremities, abdominal pain, neuropathy in his lower extremities, and tremors in his upper extremities; that he uses a cane to ambulate secondary to his hip fracture and DVT; and that Newsome's coagulative blood therapy to prevent clotting limits his activities.

### f. Dr. Paula Young. M.D.

On March 28, 2005, Dr. Young examined Newsome and prepared a DSS Report diagnosing Newsome with, among other conditions, a seizure disorder, anemia, alcohol abuse, and hypertension (the March 2005 Report). Dr. Young reported that Newsome was prevented from working by his alcohol abuse, neuropathy, and seizure disorder. However, although Dr. Young indicated that Newsome could not work or concentrate long enough to complete a work task, she also noted that he could perform sedentary work.

### g. Dr. A Gupta, M.D.

On July 12, 2006, Dr. Gupta examined Newsome and prepared a DSS Report (the "July 2006 Report"), diagnosing Newsome with a seizure disorder, a cyst on his pancreas, and DVT. According to Dr. Gupta, Newsome had not had a seizure in a year, but Newsome was

nevertheless unable to work secondary to his seizure disorder. In addition, although Dr. Gupta stated that Newsome was not employable, he also indicated that he could perform "light" work activity. Moreover, although Dr. Gupta indicated that Newsome had restrictions in caring for himself and a seriously impaired ability to relate to others, he also noted that Newsome had the ability to concentrate long enough to complete a work task.

### h. Dr. Parita Patel, M.D.

On October 24, 2006, Dr. Patel examined Newsome and prepared a DSS Report (the "October 2006 Report") diagnosing Newsome with chronic pancreatitis and reporting that he was prevented from working by antiseizure therapy, neuropathy, and abdominal pain. In addition, Dr. Patel stated that Newsome was not employable for an indefinite period of time due to abdominal pain and alcohol abuse.

### i. Dr. Poules Salle, M.D.

On April 25, 2007, Dr. Salle examined Newsome and prepared a DSS Report diagnosing Newsome with pancreatitis and chronic seizure disorder and reporting that he was prevented from working by his antiseizure therapy, neuropathy, and abdominal pain. He further indicated that Newsome was not employable due to his abdominal pain, seizures, hip fracture, and alcohol abuse treatment. To the extent he was capable of work, Dr. Salle found that Newsome could sit for two hours a day and lift 20 pounds.

### 3. Non-Medical Evidence

### a. Ted Gladkowski

Ted Gladkowski is a social worker at Mercy Family Counseling Services. In 2005, Newsome underwent a three month day intensive alcohol abuse treatment program that was four hours a day, five days a week. On February 11, 2005, Mr. Gladkowski prepared an

Alcohol/Drug Addiction Determination and Employability Assessment for DSS.  Mr.

Gladkowski noted that in the prior two years, Newsome had undergone substance abuse inpatient

and outpatient treatments primarily for alcohol abuse.  With regard to his Newsome's medical

conditions, Mr. Gladkowski noted that based on the records of his treating physician, NP Powers,

Newsome suffered from a seizure disorder and alcohol abuse.  Although Mr. Gladkowski was

unable to address Newsome's physical limitations, he reported that Newsome's ability to have

appropriate interactions with others and engage in socially appropriate behavior were moderately

limited, and his ability to refrain from inappropriate behavior and function in a work setting were

very limited.  In addition, Mr. Gladkowski noted that Newsome's addiction contributed to the

loss of his job and interfered with the activities of daily living.  As a result, Mr. Gladkowski

found that Newsome could not participate in employment related activities, and was "probably

unemployable".  (R. 161.)

On June 13, 2005, Mr. Gladkowski prepared an Alcohol/Drug Addictions

Treatment/Discharge Progress Report for DSS where he reported the same findings with respect

to Newsome's mental limitations and employability.  The only additions on the June 13, 2005

report were that Newsome's inability to work was attributable to his seizure disorder and

neurological disorder, and that Dr. Berkowitz is also listed as one of Newsome's physicians.  In

addition, Mr. Gladkowski noted that during the course of the program, Newsome was given

fourteen toxicology tests and a breathalyzer test every day of the program for a total of seventy-

six breathalyzer tests.  Of those tests, only one came back positive on May 2, 2005.

At an unspecified time in 2006, Newsome entered another day intensive alcohol abuse

treatment program.  On July 27, 2006, Mr. Gladkowski prepared an Alcohol/Drug Determination

and Employability Assessment for DSS where he reported that Newsome's medical conditions

included alcohol and marijuana dependence, a seizure disorder, and pancreatitis and that his medications included Dilantin, Coumadin, and Percoset. With respect to Newsome's mental limitations, Mr. Gladkowski indicated that there was no evidence of limitations with regard to all but one of the listed factors, namely, the ability to function in a work setting. In that regard, Mr. Gladkowski reported Newsome was very limited in his ability to work. The basis for stating that Newsome was limited in his ability to function in a work setting was because he was in early treatment for substance abuse and his seizure disorder.

## C.  The ALJ's Findings

In the August 1, 2007 decision, the ALJ denied Newsome's disability claim. Based on the evidence presented, the ALJ opined that Newsome was not disabled within the meaning of the Social Security Act. The ALJ determined that Newsome has severe impairments including "alcohol abuse, a seizure disorder, a history of alcoholic pancreatitis, a history of bilateral lower extremity numbness, anemia, and a left hip fracture of recent onset (January 2007)". (R. 21.) The ALJ first found, however, that Newsome's impairments were not severe enough to meet or equal the impairments listed in the regulations for a disability that automatically qualifies a claimant for disability benefits.

The ALJ noted that he had reviewed the opinion of Newsome's social worker Mr. Gladkowski during the early 2005 time period indicating that Newsome's mental limitations prevented him from working. However, the ALJ noted that, while he considered the opinion in terms of assessing Newsome's mental limitations, he did not accord it great weight because Mr. Gladkowski's opinions conflicted with those of Dr. Berkowitz, Newsome's treating neurologist, during the same time period, and because a social worker is not considered an "acceptable" medical source according to the regulations. Although the ALJ credited Dr. Berkowitz's

assessment in July of 2005 that Newsome did not have any mental limitations, the ALJ did not credit Dr. Berkowitz's assessment of Newsome's physical limitations because of an apparent internal inconsistency in the July 2005 report. In particular, the ALJ noted that in the July 2005 report, Dr. Berkowitz's diagnosed Newsome with a seizure disorder, but then stated that Newsome was not employable because of "unrelated complaints" such as back pain and numbness and tingling of the legs. (R. 22.)

The ALJ also did not credit a number of the medical reports in the record based on perceived internal inconsistencies. First, the ALJ did not credit the July 2006 report of Dr. Gupta, because he found it to be internally inconsistent. Next, the ALJ did not credit an August 2006 report by NP Powers that found that Newsome could not work due to abdominal pain and treatment for alcohol abuse because a nurse practitioner is not an acceptable medical source, and because the finding that Newsome could not work was contradicted by a notation in the August 2006 report that Newsome could perform sedentary work.

Next, the ALJ rejected the DSS Reports by Dr. Patel from October of 2006 and Dr. Salle from April of 2007. The ALJ rejected both reports because they indicate that Newsome has neuropathy, which the ALJ found is not supported by objective evidence in the record. With regard to the objective evidence, the ALJ noted that an April 2007 EMG showed no evidence of neuropathy and a May 2007 workup for peripheral neuropathy was negative and Dr. Wahedna noted that Newsome's symptoms were possibly due to his alcoholism.

The ALJ then stated that he had requested that Newsome provide a treating physician statement on the materiality of alcohol to his various impairments as well as diagnostic evidence of neuropathy and DVT. Despite the fact that no such evidence was submitted, the ALJ nevertheless concluded that the record showed that alcohol was material to his impairments.

With respect to the claimed impairments allegedly caused by neuropathy, DVT, or a related condition—i.e., the numbness and pain in his lower extremities—the ALJ noted that these symptoms were alcohol induced and not the result of neuropathy because the objective tests were negative for neuropathy.  With respect to the abdominal pain, the ALJ concluded Newsome's pancreatitis was alcohol induced with the Plaintiff still drinking.  The only impairment that the ALJ concluded was not related to Newsome's alcohol abuse, was any residual ailment from the January 2007 seizure and hip fracture, which the ALJ determined would resolve within a year.  The ALJ then rejected the May 2007 RFC report by NP Powers and Dr. Rogow, finding that it was not consistent with Newsome's testimony about his physical limitations, and stating that "in any event, any disabling limitations that can be accepted as supported by the medical evidence are clearly due either to alcohol related impairments, or to the effect of the hip fracture."  (R. 24.)

The ALJ next turned to the issue of Newsome's credibility.  The ALJ reviewed Newsome's testimony and found that Newsome minimized his substance abuse and that his statements were, at times, inconsistent with his medical records.  In particular the ALJ noted that Newsome testified inconsistently about the frequency of his seizures.  He further noted that Newsome testified that his inability to work was primarily due to his seizure disorder and that he sought work when he was not having seizures, and that before the leg fracture in January 2007, he was looking for work and going to an alcohol treatment program five days a week, four hours a day.  The ALJ also questioned the credibility of Newsome's assertion that his abdominal pain and other pain contributed to his disability because the Plaintiff testified that he did not take Percoset—a prescription pain medication—prior to his January 2007 hip fracture.

The ALJ determined that, considering all of Newsome's impairments not attributable to his alcohol abuse or hip fracture, Newsome was limited in his ability to stand and walk extensive

periods of time and lift and carry heavy weight. The ALJ further determined that Newsome could sit six hours in an eight hour work day, stand and walk two hours in an eight hour work day and lift and occasionally carry ten pounds. However, the ALJ found that, due to his seizures and/or the effects of his alcohol abuse and alcohol abuse treatment, Newsome was limited in his ability to concentrate and has periods where he is unable to perform any competitive work. The ALJ determined that as a result of his mental impairments, Newsome was unable to perform his past work or make a successful adjustment to work that exists in the regional or national economy. As a result, the ALJ determined that Newsome is disabled within the framework of the medical vocational guidelines.

Finally, the ALJ determined that Newsome's mental limitations were a result of his alcohol abuse. Therefore, the ALJ concluded that alcohol abuse was a contributing factor material to the determination of Newsome's disability. Thus, the ALJ determined that "[a]bsent alcohol abuse, the claimant would have the residual functional capacity to perform a full range of sedentary work and would be found not disabled" pursuant to the applicable regulations and therefore benefits must be denied. (R. 25.)

## II.  DISCUSSION

### A. Standards of Review

When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record. See 42 U.S.C. § 405(g); Janinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Brown v. Apfel, 174 F.3d 59, 61–62 (2d Cir. 1999). Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires such

relevant evidence that a reasonable person "might accept as adequate to support a conclusion." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques; results from frequent examinations; and is consistent "with the other substantial evidence in [the] case record." See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion." Id.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark, 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In addition, the district court may remand a disability case if "there are gaps in the administrative record or the ALJ has applied an improper legal standard. . . ." Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999).

When deciding whether to remand, an important factor that the court considers is whether further findings would plainly help to assure the proper disposition of the claim. Id. at 83.

**B. Analytical Framework**

To qualify for disability benefits under 42 U.S.C. § 423(d)(1) (A), a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). The Act also provides that the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id.

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims. See 20 C.F.R. §§ 404.1520, 416.920. In the Second Circuit, the test is described as follows:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

Shaw v. Carter, 221 F.3d 126, 132 (2d Cir. 2000) (citing DeChirico v. Callahan, 134 F.3d 1177, 1179–80 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520, 416.920).  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.  Id.  When proceeding through this five step analysis, the ALJ must consider the objective medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of pain and disability; and the claimant's educational background, age, and work experience.  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

In cases where there is medical evidence of drug addiction or alcoholism, the ALJ is required to perform a secondary analysis.  Pursuant to 42 U.S.C. § 423(d)(2)(C), even if a claimant qualifies for disability benefits under the five-step analysis, the claimant "shall not be considered disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commisioner's determination that the individual is disabled".  42 U.S.C. § 423(d)(2)(C).   In determining whether a claimant's alcohol or drug abuse is a material factor, an ALJ is required to apply the Commissioner's rule codified at 20 C.F.R. §§ 416.935, 404.1535, which state:

(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism. (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol. (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine

whether any or all of your remaining limitations would be disabling.

> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 416.935, 404.1535 (1995). The claimant bears the burden of proving that drug or alcohol addiction was not a contributing factor material to the disability determination. See White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 173 (W.D.N.Y. 2004); accord Parra v. Astrue, 481 F.3d 742, 748 (9th Cir. 2007) (internal quotations omitted); Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Doughty v. Apfel, 245 F.3d 1274, 1280 (11th Cir. 2001); Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).

## C. Whether the ALJ's Finding that Neuropathy and DVT Were Not Medically Established Impairments is Supported by Substantial Evidence

Although the ALJ found that the Plaintiff had a "history of bilateral lower extremity numbness", the ALJ found that these symptoms were attributable to alcohol use, and not a medically established impairment. In making this determination, the ALJ rejected the diagnoses of neuropathy and DVT as not supported by "objective diagnostic evidence".

### 1. As to the Diagnosis of Neuropathy

Alcoholic neuropathy is generally a permanent disorder which afflicts "[u]p to half of all long-term heavy alcohol users" that can cause, among other symptoms, numbness and abnormal or painful sensations in the arms and legs. U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001733/ (Last visited Sept. 28, 2011). After

complaining of numbness and sensations in his lower extremities in 2005, Dr. Berkowitz examined the Plaintiff and performed a number of diagnostic tests, including a CT Scan of the Plaintiff's head and an MRI. Dr. Berkowitz also performed clinical tests revealing that the Plaintiff had "impaired heel to toe gait" and "impaired toe/heel walking", a tender spot in the lower dorsal spine and a muscle spasm in the dorsal region. Despite the fact that the laboratory tests were unremarkable, Dr. Berkowitz diagnosed the Plaintiff with neuropathy. The diagnosis of neuropathy was repeated in the DSS Reports of Dr. Patel in October 2006 and Dr. Salle in April of 2007. By contrast, in May of 2007, Dr. Wahedna, the Plaintiff's treating neurologist who replaced Dr. Berkowitz after he retired, in response to the Plaintiff's complaints of numbness and pain in his lower extremities, indicated in her treatment notes that the laboratory tests were negative for neuropathy, and that the Plaintiff's symptoms were possibly due to his history of alcoholism.

The ALJ did not afford any weight to the medical opinions of Dr. Patel or Dr. Salle because the ALJ found that a diagnosis of neuropathy contradicted: (1) the objective evidence that "all diagnostic tests have been negative, including an EEG, an EMG and MRI's of the claimant's cervical and thoracolumbar spine . . ." and (2) Dr. Wahedna's impression that the relevant symptoms were attributable to the Plaintiff's history of alcoholism. The ALJ does not provide any explanation as to what weight, if any, he gave to Dr. Berkowitz's opinions. "Among the ALJ's legal obligations is the duty to adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so must address all pertinent evidence." Calzada v. Astrue, 753 F. Supp. 2d 250, 275 (S.D.N.Y. 2010). Here, the ALJ did not sufficiently explain why he found that neuropathy could only be supported by laboratory tests as opposed to

other medical signs, nor why he failed to accord any weight to the medical opinion of Dr.

Berkowitz.

First, the requirement that the Plaintiff produce the results of laboratory tests as the only

form of objective evidence to support a diagnosis of neuropathy is not supported by the

regulations or the record.  The regulations define objective medical evidence as medical evidence

and laboratory findings, 20 C.F.R. § 404.1512(b)(1), which in turn are defined as follows:

> (b)  Signs are anatomical, physiological, or psychological
> abnormalities which can be observed, apart from your statements
> (symptoms). Signs must be shown by medically acceptable clinical
> diagnostic techniques. . . .
>
> (c)  Laboratory findings are anatomical, physiological, or
> psychological phenomena which can be shown by the use of
> medically acceptable laboratory diagnostic techniques. Some of
> these diagnostic techniques include chemical tests,
> electrophysiological studies (electrocardiogram,
> electroencephalogram, etc.), roentgenological studies (X-rays), and
> psychological tests.

20 C.F.R. §§ 404.1528 (b) and (c).  Although the ALJ is correct in stating that the Plaintiff's

EEG, EMG, and MRI's of his cervical and thoracolumbar spine were negative for neuropathy,

the ALJ disregards the equally accepted "medical signs" underlying Dr. Berkowitz's diagnosis

that the Plaintiff had "impaired heel to toe gait" and "impaired toe/heel walking", a tender spot in

the lower dorsal spine and a muscle spasm in the dorsal region.

The ALJ provides no basis beyond his own personal opinion that a doctor can <u>only</u>

support a diagnosis of neuropathy with laboratory findings.  In fact, according to the U.S.

Department of Medicine, laboratory tests are done to rule out other possible causes of

neuropathy, not the existence of alcoholic neuropathy itself.  <u>See</u> U.S. National Library of

Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001733/ (Last visited Sept. 28,

2011).  There is certainly no consensus on the need for confirmation from laboratory tests in the

record.  Although Dr. Wahedna was dismissive in treatment notes of the neuropathy diagnosis

based on the results of the laboratory tests, Dr. Berkowitz, who was the Plaintiff's treating

neurologist for almost a year, continued to diagnose the Plaintiff with neuropathy even after the

laboratory test results were unremarkable.

It is unclear from the record whether alcoholic neuropathy is the type of the disorder that

can only be confirmed through laboratory tests. Therefore the ALJ's findings that the absence of

such objective evidence is determinative of whether the Plaintiff suffers from neuropathy, and

thus that Dr. Patel and Dr. Salle's opinions to the contrary are not entitled to any weight,

constituted legal error and are not supported by substantial evidence. See Rosa v. Callahan, 168

F.3d 72, 79 (2d Cir. 1999) (finding legal error where an ALJ rejected a treating physician's

opinion on the ground that the treating physician "did not report findings of muscle spasm to

corroborate any loss of motion" because "as a 'lay person,' the ALJ simply was not in a position

to know whether the absence of muscle spasms would in fact preclude the disabling loss of

motion described by [the treating physician] in his assessment") (quoting Wagner v. Sec'y of

Health & Human Servs., 906 F.2d 856, 861 (2d Cir. 1990)).

However, even assuming that the lack of laboratory findings was determinative to the

diagnosis of neuropathy, the Court would nevertheless remand the case based on the ALJ's

violations of the treating physician rule with respect to Dr. Berkowitz's opinions.

The ALJ is required to accord special evidentiary weight to the opinion of the treating

physician, as long as the treating physician's opinion is supported by medically acceptable

techniques, results from frequent examinations, and is supported by the administrative record.

See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 119 (2d Cir. 1998). The important "treating

physician rule," as it is known, "mandates that the medical opinion of the claimant's treating

physician [be] given controlling weight if it is well supported by the medical findings and not

inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). However, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

If the opinion of the treating physician as to the nature and severity of the impairment is not "well-supported" by objective evidence, the obligation to give controlling weight to a treating physician's opinion is inapplicable. Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). When controlling weight is not given to a treating physician's medical opinion, the ALJ must consider various "factors" to determine how much weight to give the opinion, such as: (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Halloran, 362 F.3d at 32.

Furthermore, the ALJ must provide "good reasons" for not crediting the opinion of a plaintiff's treating physician. See 20 C.F.R. § 416.927(d)(2); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)). "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (quoting Halloran, 362 F.3d at 33; citing 20 C.F.R. § 404.1527(d)(2)). An ALJ's "[f]ailure to provide

such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.'" Id. at 129–30 (quoting Snell, 177 F.3d at 133).

Based on the records, Dr. Berkowitz was the Plaintiff's treating neurologist from April 1, 2005 until at least November 1, 2005. During this time period, the records reflect that Dr. Berkowitz met with the Plaintiff at least four times and performed a number of clinical and laboratory tests, pursuant to which he diagnosed the Plaintiff with a seizure disorder and neuropathy. This treatment relationship qualifies Dr. Berkowitz as a treating physician under the regulations. As such, the ALJ was required to either give Dr. Berkowitz's opinions controlling weight, or provide "good reasons" for not giving his opinions controlling weight. Nevertheless, the only reference to Dr. Berkowitz in the decision is when the ALJ is explaining that he discounted the opinion of the Plaintiff's social worker with respect to the Plaintiff's mental limitations because they conflicted with that of the Plaintiff's "treating neurologist" in July and November of 2005. As an aside, the ALJ then notes that he found Dr. Berkowitz's two reports "somewhat inconsistent with each other, and the earlier report, while giving a diagnosis of seizure disorder, inconsistently concludes that the claimant no longer had seizures but could not work because of unrelated complaints, such as back pain and numbness and tingling of the legs, etc.". (R. 22.)

First, the alleged "inconsistency" identified by the ALJ is based on a mischaracterization of Dr. Berkowitz's July 2005 DSS Report. It was the ALJ, not Dr. Berkowitz, who described the Plaintiff's symptoms as "unrelated complaints" to the seizure disorder. In discrediting Dr. Berkowitz's report as "inconsistent" the ALJ improperly substituted his own medical finding that the Plaintiff's symptoms were not attributable to the seizure disorder for that of the treating

physician.  Thus, the only stated basis for rejecting Dr. Berkowitz's opinion is not supported by substantial evidence.

Finally, it is noted that the ALJ relied on Dr. Berkowitz's opinion about the Plaintiff's mental limitations in summarily rejecting the opinion of the Plaintiff's social worker, while seemingly affording it no weight at all in determining whether the Plaintiff had neuropathy.  The ALJ's silence on the medical opinions of Dr. Berkowitz on the diagnosis of neuropathy prevents this Court from determining whether the rejection of the neuropathy diagnosis was supported by substantial evidence.  See Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see also Halloran, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.")

### 2.  As to the Diagnosis of DVT

The Plaintiff has been diagnosed with DVT and thrombotic emboli and, as a result, has a vena cava filter implanted in his right femoral vein and takes the medication Coumadin to prevent blood clots.  The Plaintiff was first diagnosed with DVT in an August 2006 DSS Report.  On January 20, 2007, a permanent vena cava filter was implanted in his right femoral vein.  The diagnosis for DVT was also noted in the Plaintiff's summary discharge form from the Nassau Extended Care Facility on February 28, 2007.  Moreover, the May 2007 RFC report by NP Powers and Dr. Rogow included DVT in the list of the Plaintiff's impairments, and specifically noted that the Plaintiff has to lay down during the day in part due to "DVT pain in lower extremities"; that he uses a cane to ambulate secondary not only to his hip fracture, but also the DVT; and that the Plaintiff's coagulative blood therapy to prevent clotting limits his activities.

(R. 178, 181.)  Nevertheless, the ALJ rejected this diagnosis on the ground that "nothing in the record establishes by objective diagnostic evidence that the claimant does, in fact, have a medically established impairment of DVT . . . ."  (Tr. 23.)

While the ALJ was correct in noting the lack of objective evidence supporting the diagnosis of DVT, the records reflect that the Plaintiff had a vena cava filter implanted in his right femoral vein to treat the DVT, was taking Coumadin to treat the DVT, and was undergoing coagulation therapy.  Taken together, these facts "would suggest that the absence of any supporting evidence might be attributable to deficiencies in the administrative record rather than fabrication" by the Plaintiff.  Calzada v. Astrue, 753 F. Supp. 2d 250, 275 (S.D.N.Y. 2010). Moreover, there is no evidence that the ALJ took into account any of the other evidence in the record, including the medical opinions of treating physicians and other medical sources in rejecting the diagnosis of DVT.  Accordingly, the Court finds that the ALJ's rejection of the DVT diagnosis, an undeveloped record and without consideration of all of the available evidence in the record, is not supported by substantial evidence.  See SSR 96-5P, 1996 WL 374183, at *3 (July 2, 1996) ("The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.").

**D.  Whether the ALJ's Finding that the Plaintiff was not "Fully Credible" Is Supported by Substantial Evidence**

The ALJ found that the Plaintiff's testimony was not "fully credible" because "many of his allegations were either not consistent with the medical evidence, or were inconsistent with his prior statements".  (R. 24.)

If an ALJ finds that a claimant is not credible, he must set forth the reasons for that finding "with sufficient specificity to permit intelligible plenary review of the record."  Williams v. Bowen, 859 F.2d 255, 260–61 (2d Cir. 1998) (citing Carroll v. Sec'y of Health & Human Servs., 705 F .2d 638, 643 (2d Cir. 1983)); Osorio v. Barnhart, No. 04-CV-7515, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006) (a determination of credibility will "be set aside if it is not set forth with 'sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence.' ").  A reviewing court must defer to an ALJ's finding regarding a claimant's credibility when it is supported by substantial evidence.  Id. (citing Aponte v. Sec'y of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)).

The Plaintiff argues that the ALJ erred assessing his credibility with respect to:  (1) his current alcohol use and (2) his subjective assessment of pain.  As set forth below, although the ALJ provided sufficient detail as to why he discounted the Plaintiff's allegations regarding his alcohol abuse, his determination with respect to the Plaintiff's subjective assessment of pain is not supported by substantial evidence.

**1.  As to the Plaintiff's Alcohol Abuse**

Here, the ALJ's determination that the Plaintiff at all relevant times had an alcohol abuse problem is supported by substantial evidence.  The records from when the Plaintiff was admitted to the MMC with seizures on June 24, 2004 state that the Plaintiff's seizures were caused by alcohol withdrawal, that the Plaintiff had a "significant past history of alcohol dependency and

other drug abuse (cannabis)" and that the Plaintiff's family and the Plaintiff himself informed the doctor that he had a history of repeated seizures associated with alcohol withdrawal. (R. 103.) The records from the Plaintiff's September 29, 2004 stay at the MMC for seizures caused by alcohol withdrawal state that the Plaintiff informed the doctor that he drinks one pint of vodka daily and that his last drink was the day before his seizure. The toxicology screen confirmed that the Plaintiff had significant levels of alcohol in his system. DSS Reports dated March 2005 and August 2006 indicated that the Plaintiff suffered from alcohol abuse, and on November 21, 2006, the Plaintiff informed the doctors at the NUMC that he was still drinking. The records of the Plaintiff's social worker reveal that the Plaintiff was undergoing day intensive alcohol abuse treatment in 2005 and in 2006, and has also undergoing treatment for alcohol abuse in 2003 and 2004. The May 2007 RFC report by the Plaintiff's treating physicians indicated that the Plaintiff was still undergoing treatment for alcohol abuse. Thus, there is substantial evidence in the record to support the ALJ's finding that the Plaintiff suffered from alcohol dependence.

With regard to the Plaintiff's alcohol consumption since January 2007, the only evidence in the record speaking to this issue is the Plaintiff's own statement that he had stopped drinking in January 2007. The Court finds no error in the ALJ's decision not to credit the Plaintiff's testimony in this regard. The ALJ determined that the Plaintiff was not credible regarding his alcohol abuse. At the hearing, the Plaintiff testified that he was only a social drinker who consumed one or two drinks a night a few nights a week. The ALJ found that this testimony contradicted the Plaintiff's admissions to his treating and examining physicians about the quantities of alcohol he consumed as well as the above stated evidence indicating that the Plaintiff had a substance abuse problem and could not work because he was undergoing alcohol abuse treatment. The Plaintiff argues that it was improper for the ALJ to use past evidence of his

alcohol abuse as evidence that he was still abusing alcohol when assessing his then current impairments. However, given the Plaintiff's minimization of his alcohol use and denial about the extent of his problem, the ALJ's decision not to credit the Plaintiff's representation that he had not had a drink since January 2007 was not in error.

## 2. As to the Plaintiff's Subjective Complaints of Pain

The Plaintiff argues that the ALJ's decision should be reversed because he did not properly assess the Plaintiff's credibility with regard to his subjective assessment of pain. The Court agrees.

"If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." Bennett v. Astrue, No. 07-CV-780, 2010 WL 3909530, at *8 (N.D.N.Y. Sept. 30, 2010) (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi),416.929(c) (3)(i)-(vi)); Taylor v. Barnhart, 83 F. App'x. 347, 350 (2d Cir. 2003) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(iv)).

Based upon a review of the record, the Court finds that the ALJ did not properly assess the Plaintiff's credibility. The ALJ first found that the medical evidence did not support the Plaintiff's complaints of pain because his alleged neuropathy and DVT were not objectively verifiable conditions. As previously stated, this finding was not supported by substantial evidence. Moreover, unlike the diagnoses of neuropathy and DVT, there is no dispute that the medical conditions causing the Plaintiff's abdominal pain are supported by objective evidence.

The presence of pancreatitis and the pseudocyst were confirmed by diagnostic tests. A CT scan of the Plaintiff's abdomen on May 31, 2006 revealed findings compatible with pancreatitis and free fluid in the pelvis. In addition, the CT scan showed that the Plaintiff had a 2.0cm pseudocyst on his pancreas.

The ALJ then considered the Plaintiff's allegations of pain in light of his daily activities, which as the ALJ noted in his decision, included looking for work, attending an alcohol abuse treatment program five days a week, four hours a day, maintaining his abstinence, and staying mobile to decrease the swelling in his pancreas. The ALJ did not probe into the exertional requirements of each of these activities, but rather "the ALJ selectively cited portions of the record concerning Plaintiff's activities without obtaining important details". Selinsky v. Comm'r of Social Sec., No. 08-CV-1363, 2010 WL 2671502, at *6, *7 (N.D.N.Y. June 14, 2010) ("In this case, Plaintiff testified to limitations caused by pain while sitting, walking, lifting, and standing. The ALJ discounted this testimony based, in large measure, upon his assessment that Plaintiff's activities of daily living contradicted the limitations. However, as set forth above, the ALJ was too quick to reach conclusions about Plaintiff's activities and did not properly develop the record as to the nature and extent of, for example, the 'night watchman' job.").

Finally, the ALJ noted that while the Plaintiff is taking prescription pain medication, he testified that he had only been taking it since January of 2007. Therefore, the ALJ attributed any disabling pain to the hip fracture that occurred at that time. As an initial matter, the Court finds that the ALJ's decision to discount the pain associated with the Plaintiff's hip fracture when assessing his credibility and residual functional capacity is not supported by substantial evidence. The ALJ concluded, without explanation or citation to evidence in the record that any disabling limitations caused by the hip fracture "will likely heal sufficiently to permit at least sedentary

work within one year of onset". (R. 24.) By contrast, the Plaintiff's treating physicians stated in the May 2007 RFC report that the Plaintiff's physical limitations caused by his medical conditions, including the hip fracture, are expected to last longer than twelve months. While the May 2007 RFC report made this finding based on all of the Plaintiff's medical conditions, it nevertheless suggests that further inquiry was necessary to determine whether the hip fracture on its own might produce disabling symptoms lasting for more than a year. The ALJ's apparently independent assessment of the severity of the Plaintiff's injury is not a valid basis discounting the pain and disabling effects caused by the hip fracture.

In addition, the evidence in the record reveals that not only did the Plaintiff fracture his hip in January 2007, but he also had a vena cava filter implanted to prevent blood clots. Beyond the coincidence of the implant surgery and the hip fracture, there is no evidence in the record that the blood clots are a result of the hip fracture as opposed to one of the Plaintiff's pre-existing conditions. As the Plaintiff's treating physicians noted in the May 2007 RFC report, the Plaintiff was using a cane to ambulate secondary to his hip fracture and the DVT. Thus, whether prescription medication would be necessary as of January of 2007 absent the hip fracture is not clear from the record.

Moreover, the fact that the Plaintiff testified that he was prescribed pain medication after his hip fracture did not obviate the need for the ALJ to examine the remainder of the record to determine whether the Plaintiff was experiencing significant pain prior to the hip fracture. Such a review would have revealed medical records showing that prior to the hip fracture, the Plaintiff's doctors were prescribing prescription medication for abdominal pain and the pain in his lower extremities, that the Plaintiff had been hospitalized twice with abdominal pain, and was frequently noted to be "not employable" based in part on his abdominal pain. Furthermore, there

34

is no indication that the ALJ considered the side effects of any medications or treatments in his assessment of the Plaintiff's credibility.

Thus, the ALJ did not properly considered the evaluative factors set forth in the regulations, and his determination that plaintiff's subjective complaints of pain should be discounted is not supported by substantial evidence. As a result, "the Court is left with no basis upon which to determine whether the appropriate legal standards were applied, nor can it evaluate whether the ALJ considered the entire evidentiary record in arriving at his conclusion". Bennett, 2010 WL 3909530, at * 10.

**E.  Whether the ALJ's RFC Assessment Violated the Applicable Legal Standard**

The ALJ found the following with respect to the Plaintiffs RFC:

> When alcohol abuse is removed from consideration, the claimant has the residual functional capacity to perform the full range of sedentary work, as he can sit six hours in an eight hour work day, stand and walk two hours in an eight hour work day, and lift and carry ten pounds occasionally.

> When the claimant's alcohol abuse is factored into his impairments, he has a limited ability to concentrate, and has periods when he could not sustain the performance of any competitive work.

(R. 25–26.) The Plaintiff argues that the ALJ applied the incorrect legal standard by factoring in the materiality of his alcohol abuse prior to making a disability determination.

The "plain text of the regulation" requires the ALJ to first use the standard sequential analysis to determine whether the claimant is disabled, "without segregating out any effects that might be due to substance use disorders." Day v. Astrue, No. 07-CV-157, 2008 WL 63285, at *5 (E.D.N.Y. Jan 3, 2008) (quoting Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003)). The ALJ's initial disability determination under the regulations "concerns strictly symptoms, not causes".  Brueggemann, 348 F.3d 689 (8th Cir. 2003).

The Court finds no error in the ALJ's application of the legal standard and assessment of the relevant evidence in regards to the Plaintiff's mental limitations. The ALJ determined that the Plaintiff had an alcohol abuse problem and a seizure disorder, both of which interfered with his ability to concentrate and perform competitive work. As a result of the mental impairments caused by the alcoholism and seizure disorder, the ALJ determined that the Plaintiff was disabled. The ALJ then determined that if alcohol was removed from the equation, any mental impairments caused by the alcohol abuse or the seizure disorder would resolve. This finding is supported by substantial evidence.

However, the Court finds that the ALJ's did not follow the proper procedure of going through the five-step process before making a materiality determination with respect to the Plaintiff's impairments that cause physical limitations. Rather than first determining the Plaintiff's present physical limitations and then assessing which would remain if the Plaintiff stopped drinking alcohol, the ALJ made an RFC assessment that the Plaintiff could perform sedentary work without taking into account any disabling symptoms causing physical limitations that he determined were attributable to the Plaintiff's alcohol abuse.

Although applying the wrong legal standard might not require reversal if the error did not affect the outcome, that is not the situation here. An ALJ has not sufficiently performed his duties under the regulations where a court cannot determine whether his findings are supported by substantial evidence. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). Unlike the ALJ's findings, the RFC assessments by the Plaintiff's treating and examining physicians are based on all of the Plaintiff's symptoms, not just those that exist independent of the alcohol abuse or the hip fracture. Thus, there is a lack of substantial evidence in the record supporting the ALJ's RFC assessment of the Plaintiff's physical limitations and therefore the decision must be reversed and

remanded.  See Orr v. Barnhart, 375 F. Supp. 2d 193, 201 (W.D.N.Y. 2005) (remanding to require the ALJ "to consider the ill effects that plaintiff's alcoholism had on her impairments and limitations" when determining the issue of disability and "only after finding that plaintiff is disabled, determine which impairments would remain if plaintiff stopped using alcohol"); Frederick v. Barnhart, 317 F. Supp. 2d 286, 293 (W.D.N.Y.2004) (reversing ALJ's disability determination where "the ALJ never determined whether, absent alcohol abuse, plaintiff's mental impairments would still meet the severity of Listing 12.04 . . ."); Lunan v. Apfel, No. 98-CV-1942, 2000 WL 287988, *8 (W.D.N.Y., March 10, 2000) (reversing ALJ's disability determination where ALJ failed to determine whether plaintiff was disabled prior to finding that alcoholism was a contributing factor material thereto).

## F.  Whether the ALJ's Materiality Finding is Supported by Substantial Evidence

Whether the Plaintiff's impairments are caused by alcohol, as opposed to his history of alcoholism, is a distinction with a difference.  An impairment caused by alcohol use can be resolved if the Plaintiff stops drinking.  An impairment caused by the Plaintiff's history of alcoholism can be permanent, and therefore remain disabling regardless of whether the Plaintiff stops drinking.  However, permanent impairments from alcoholism may not be disabling on a daily basis, but may become disabling when the Plaintiff consumes alcohol.  At the hearing, the ALJ acknowledged that he did not have the medical expertise to determine whether any of the Plaintiff's conditions would improve or resolve if he stopped drinking and stated that he would need a report from a treating physician addressing the issue of materiality to decide the issue. There is simply nothing in the record by a treating physician to that effect with respect to any of the Plaintiff's impairments.  However, rather than note that it was unclear and therefore that additional information was required or that the Plaintiff failed to meet his burden, the ALJ made

an objective medical finding that the Plaintiff's alcohol abuse was material to the Plaintiff's disability. As set forth below, the Court finds that the ALJ's materiality determination only with regard to the Plaintiff's mental limitations is supported by substantial evidence. The record with respect to the Plaintiff's physical limitations is insufficiently developed to support the ALJ's decision.

### 1. As to the Plaintiff's Mental or Non-Exertional Limitations

The ALJ found that the Plaintiff was "limited in his ability to concentrate, and has had periods when he could not sustain the performance of any competitive work, due to seizures and/or to the effects of alcohol abuse and treatment therefore". (R. 25.) Because the ALJ found that alcohol abuse was material to the Plaintiff's seizure disorder, and there was no evidence of the Plaintiff experiencing mental limitations when he was not suffering from seizures, the ALJ determined that they did not constitute a disability. This finding is supported by substantial evidence.

The records reflect that when the Plaintiff was admitted to the hospital with seizures in June and September of 2004, both times he was diagnosed with alcohol withdrawal and the doctors noted that the seizures stopped after the Plaintiff went through detoxification. On December 29, 2004, NP Powers prepared a DSS Report diagnosing the Plaintiff with alcohol induced seizures. NP Powers based these finding on the Plaintiff's seizure disorder, alcohol induced seizures, non-compliance with medications, failure to seek regular doctor care for seizures, the fact that his EEG was normal and that the Plaintiff had admitted to drinking large quantities of vodka. The Plaintiff also stated at the hearing that his last seizure was in January 2007, which the ALJ noted corresponded to a time when the Plaintiff claimed he was still drinking. Moreover, the Plaintiff's treating neurologist, Dr. Wahedna indicated in treatment

notes that although the Plaintiff claimed he had a seizure disorder, it was questionable since he had not had a seizure since January 2007. Thus, there is substantial evidence to support the ALJ's finding that the alcohol use is material to the Plaintiff's seizure disorder. See Orbaker v. Apfel, 70 F. Supp. 2d 291, 295–96 (W.D.N.Y. 1999) (finding substantial evidence for ruling that alcoholism was a contributing factor to disability because record revealed that the plaintiff's mental health improved significantly when the plaintiff abstained from alcohol).

Furthermore, the ALJ determined that the Plaintiff's testimony with respect to his seizures and mental limitations was not credible insofar as it was inconsistent and contradicted by the medical evidence. Despite the Plaintiff's protestations, there is ample support for this finding in the record. When questioned about the frequency of his seizures, the Plaintiff testified that he had seizures once or twice every three months between November of 2003 and January 2007. However, the July 2006 DSS Report by Dr. Gupta notes that the Plaintiff had not had a seizure in a year. At the hearing, the ALJ questioned the Plaintiff further about the frequency of his seizures based on the representation in Dr. Gupta's report and the Plaintiff admitted that he did not have a seizure for an entire year. The Plaintiff argues that his affirmative response was merely confirming the content of the medical records, and not intended as an admission. This argument is contrary to his statements on the record. In addition, it is not within the purview of this Court to dispute the ALJ's interpretation of the testimony. Moreover, where, as here, the medical evidence contradicts the Plaintiff's statements, the ALJ acted within his discretion in deciding to credit the medical evidence.

Finally, the Plaintiff contends that the ALJ did not give appropriate weight to the opinions on his mental limitations of Mr. Gladkowski, the Plaintiff's social worker who oversaw his numerous alcohol abuse treatments at the Mercy Family Center. The record contains three

reports completed by Mr. Gladkowski for DSS dated February 2005, July 2005, and July 2006. In the February 2005 and July 2005 reports, Mr. Gladkowski reported that the Plaintiff could not participate in employment related activities and was "probably unemployable" because his ability to have appropriate interactions with others and engage in socially appropriate behavior were moderately limited, and his ability to refrain from inappropriate behavior and function in a work setting were very limited. In the July 2006 report, Mr. Gladkowski indicated that, although there was no evidence of any of any specific mental limitation, the Plaintiff was very limited in his ability to function in a work setting because he was in early treatment for substance abuse and because he had a seizure disorder.

The Plaintiff argues that the ALJ was required to afford greater weight to Gladkowski's opinions about his mental limitations because a social worker is an acceptable "other source", and he was "the sole source that had regular mental health treatment relationship with plaintiff". (Pl.'s Br. at 16.) However, contrary to the Plaintiff's representation, the ALJ specifically stated that he did consider the social worker's opinions about the Plaintiff's mental impairments, but afforded them little weight because they contradicted the mental impairment assessment of the Plaintiff's treating physicians during the same 2005 time period. In particular, the April 2005 report by Dr. Berkowitz, the Plaintiff's treating neurologist, stated that the Plaintiff did not have any mental restrictions or impairments and could concentrate long enough to complete a work task. "[T]he ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him." Diaz v. Shalala, 59 F.3d 307, 313–14 (2d Cir. 1995). The ALJ did not abuse his discretion in crediting the controlling opinion of the Plaintiff's treating neurologist over that of his social worker.

## 2. As to the Plaintiff's Physical or Exertional Limitations

With respect to the Plaintiff's symptoms causing physical or exertional limitations, the ALJ concluded that "any disabling limitations that can be accepted as supported by the medical evidence are clearly due to either alcohol related impairments, or to the effect of the hip fracture . . . [which] will likely heal sufficiently to permit at least sedentary work within one year of the onset". (R. 24.) After a review of the ALJ's decision and the evidence of record, the Court finds that the ALJ was remiss in developing the record as to the materiality of alcohol abuse to the Plaintiff's disabling symptoms that affect his physical limitations, and therefore his findings in this regard are not supported by substantial evidence.

While the medical evidence reflects that the Plaintiff's alcohol abuse was a contributing factor to his abdominal pain and the numbness and pain in his lower extremities, the record is equally clear that none of the treating physicians expressed an opinion regarding what the severity of the Plaintiff's pain would be if he abstained from alcohol consumption. Thus, the ALJ's conclusion that all of the Plaintiff's impairments that caused physical limitations would be resolved if he stopped drinking was nothing more than a guess.

Under the regulations, the ALJ has an affirmative obligation to develop the administrative record. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982). The regulations describe this duty by stating that, "[b]efore we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). The Court finds that the ALJ did not satisfy his duty of developing the record in this case. The ALJ requested that the Plaintiff's counsel obtain a report from one of the

Plaintiff's treating physicians, preferably NP Powers, specifically addressing the issues of when, if ever, the Plaintiff's impairments became permanent and whether the Plaintiff's alcohol abuse was material to his disability. The record indicates that the Plaintiff did not provide such a report. Rather, the Plaintiff submitted the May 2007 RFC report by NP Powers and Dr. Mark Rogow, which included a comprehensive list of the Plaintiff's diagnoses and physical and mental limitations. However, this report did not identify which, if any, of the Plaintiff's conditions were permanent, and which, if any, of the Plaintiff's conditions would either dissipate or become manageable if the Plaintiff stopped drinking.

The fact that the ALJ requested additional information from the Plaintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record. "[Wh]ere there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting Perez, 77 F.3d at 47); see also Pratts v. Charter, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty . . . exists even when . . . the claimant is represented by counsel.") (citations omitted) (alterations in original)); Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (holding that where the "clinical findings [are] inadequate, it [is] the ALJ's duty to seek additional information from [the treating physician] sua sponte"). In contrast to the Plaintiff's mental limitations, the record does not contain sufficient evidence to warrant a finding of materiality with respect to the Plaintiff's physical limitations.

The ALJ determined that the Plaintiff's abdominal pain was attributable to alcohol use because "[h]is pancreatitis was described as alcoholic pancreatitis, with the claimant still

drinking". (R. 24.) The ALJ does not indicate which of the Plaintiff's treating physicians made this finding, and the citation in the decision does not exist in the record. Accordingly, this cannot serve as a valid basis for the ALJ's decision. To further support this contention, the ALJ cites to the fact that in October 2006, the Plaintiff complained of abdominal pain and the doctor noted that he had been a heavy drinker for 27 years, and that when he complained of abdominal pain in November of 2006, he admitting that he was still drinking. While this may be sufficient to show that the Plaintiff's pain is exacerbated by the use of alcohol, it is not substantial evidence that the Plaintiff only experiences pain, or only experiences debilitating pain, when drinking. Absent from the record is medical evidence addressing the effects of the Plaintiff's pancreatitis and the pancreatic pseudocyst on the Plaintiff's residual functional capacity when he is not drinking. Nor for that matter, do the records indicate the difference in the level of pain the Plaintiff experiences when he is or is not abusing alcohol.

Furthermore, the Court also finds that the ALJ's failure to develop the record with respect to Dr. Wahedna impedes the Court's ability to determine whether the ALJ's finding that the Plaintiff's bilateral lower extremity numbness and pain were not disabling or were otherwise attributable to alcohol use.

The ALJ gave controlling weight to the impression by Dr. Wahedna that the Plaintiff's laboratory results were negative for neuropathy and that his symptoms were "possibly" due to his history of alcoholism. Based on these representations in Dr. Wahedna's treatment notes, the ALJ determined that the Plaintiff did not suffer from neuropathy, and that any of his alleged neuropathy related symptoms were attributable to alcohol use. In this regard, the ALJ extended Dr. Wahedna's comments beyond their meaning. A statement in treatment notes that symptoms are "possibly" due to a history alcoholism is not only speculative, but symptoms due to a history

of alcoholism is not the equivalent of symptoms caused by continued alcohol use.  Therefore, the

ALJ's findings based on Dr. Wahedna's notes are not supported by substantial evidence.  Cf.

Blankenship v. Astrue, 635 F. Supp. 2d 447, 451 (W.D. Va. 2009) (affirming ALJ's finding that

alcohol consumption was material to the plaintiff's alcohol neuropathy where the treatment

records indicated that she "was intoxicated during many of the occasions on which she sought

and received medical treatment" and that "most of her doctors attributed her symptoms to

continuing alcohol abuse").

Even assuming that Dr. Wahedna's notes are equivalent to a determinative statement that

the Plaintiff does not have neuropathy, Dr. Wahedna does not discount the existence of the

symptoms, nor for that matter does Dr. Wahedna make any representation as to how these

symptoms impact the Plaintiff's residual functional capacity or to what extent, if any, alcohol

affects the severity of the symptoms.  The selective decision to give the diagnosis of a treating

physician controlling weight, without requesting an actual medical opinion or an RFC

assessment from that same treating physician, was prejudicial to the Plaintiff.  See Dickson v.

Astrue, No. 06-CV-511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) ("In this case, the

administrative transcript does not contain any statements from any of plaintiff's treating sources

regarding how plaintiff's impairments affect her ability to perform work-related activities. . . .

Thus, the ALJ had an affirmative duty, even if plaintiff was represented by counsel, to develop

the medical record and request that plaintiff's treating physicians assess plaintiff's functional

capacity. The ALJ's failure to seek medical evaluations from plaintiff's treating sources and to

apply the proper standard to assess plaintiff's ability to meet the mental demands of work,

deprived plaintiff of a full hearing.") (citing Rosado v. Barnhart, 290 F. Supp. 2d 431, 441

(S.D.N.Y. 2003); accord Rosa v. Callahan, 168 F.3d 72, 79–80 (2d Cir. 1999) (holding that the

ALJ should have requested that a treating physician supplement his findings with additional information where the ALJ only had the treating physicians "sparse notes" and conclusory statements, because the ALJ's "fail[ure] to request any additional records or support from [the treating physician]" meant that the "the ALJ was left to base her conclusions on incomplete information that was necessarily 'conclusive of very little.'") (quoting Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, (2d Cir. 1990)).

As Judge Glasser noted in Peed v. Sullivan, 778 F. Supp. 1241 (E.D.N.Y. 1991):

> Because the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician. What is valuable about the perspective of the treating physician—what distinguishes him from the examining physician and from the ALJ—is his opportunity to develop an informed opinion as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician. It is the opinion of the treating physician that is to be sought; it is his opinion as to the existence and severity of a disability that is to be given deference.

Id. at 1246. As the court noted in Robins v. Astrue, No. 10-CV-3281, 2011 WL 2446371 (E.D.N.Y. June 15, 2011), this analysis is equally applicable to the need for treating physician determinations in the context of assessing a claimant's residual functional capacity. 2011 WL 2446371, at *4; see also Johnson v. Astrue, No. 10-CV-2321, 2011 WL 4348302, at *10 (E.D.N.Y. Sept. 16, 2011) (holding that under the regulations "the Commissioner has an affirmative duty to request RFC assessments from plaintiff's treating sources despite what is otherwise a complete medical history") (citing 20 C.F.R. §§ 404.1512(d), 404.1513(b)(6)).

Finally, to the extent the bilateral lower extremity numbness is attributable to the alleged DVT,

the record is devoid of any indication that the Plaintiff's DVT is caused or exacerbated by alcohol use.

In this case, the ALJ committed legal error in failing develop the record or seek clarification of the treating physicians' assessments before arbitrarily deciding that the Plaintiff's symptoms were either attributable to the hip fracture or alcohol consumption. The ALJ did not cite any evidence in the record beyond "the coincidence of diagnoses and treatment" to support his conclusion regarding the effects of plaintiff's alcoholism on his physical impairments. Ostrowski v. Barnhart, No. 01-CV-2321, 2003 WL 22439585, at *4 (D. Conn. Oct. 10, 2003). Thus, because an ALJ "'cannot arbitrarily substitute his own judgment for competent medical opinion'", the ALJ's decision must be reversed. Rosa, 168 F.3d at 79 (citing McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).

**G. Remedy**

The Plaintiff does not deny that he bears the burden of proving that substance abuse was not a contributing factor material to the disability determination. However, the Plaintiff argues that under the Eighth Circuit's reasoning in Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003), if the record is unclear as to whether substance abuse is material to his disability, then a finding of non-material is warranted. Here the ALJ did not find that the record was unclear, but rather made a definitive finding that the Plaintiff's alcohol abuse was a material contributing factor to his disability. Accordingly, the Court does not need to presently resolve this issue, which remains undecided in the Second Circuit. See Ostrowski, 2003 WL 22439585, at *4 (remanding without reaching a decision the issue of whether a finding of non-materiality is required where it is unclear from the record whether alcohol is material to the disability because

"[t]he ALJ found the conditions to be separable and did not address the question of what should be done when the evidence suggests the conditions to be inseparable.").

The Court finds that the administrative record is incomplete and that the ALJ applied an improper legal standard. Accordingly, the Court remands the case to the ALJ for further proceedings consistent with this decision. Upon remand, the ALJ shall set forth his finding with particularity on the issues discussed in this opinion as well as any other areas that the ALJ deems appropriate for further review so that the Court may adequately review the record. See Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) ("Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally vacate and instruct the district court to remand the matter to the Commissioner for further consideration.").

### III. CONCLUSION

For the foregoing reasons it is hereby,

**ORDERED**, that the Plaintiff's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is granted, and it is further

**ORDERED**, that the Commissioner's cross-motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is denied, and it is further,

**ORDERED**, that this case is remanded to the ALJ for further proceedings consistent with this decision, and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.


**SO ORDERED**.
Dated: Central Islip, New York
September 30, 2011

_/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge